# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| RIO ASSOCIATES, L.P., *et al.*, <br>                                              *Plaintiffs,* <br><br> v. <br><br> AUBREY L. LAYNE, JR., *et al.*, <br>                                              *Defendants.* | CASE NO. 3:15-cv-00012 <br><br> <u>MEMORANDUM OPINION</u> <br><br> JUDGE NORMAN K. MOON |

      Rio Associates, L.P.P. and Mimosa, L.L.C. (collectively, "Plaintiffs") initiated this action for declaratory judgment pursuant to 28 U.S.C § 2201 and injunctive relief pursuant to 28 U.S.C. § 1651 on March 6, 2015. This case arises out of planned construction on and around Route 29 in Charlottesville, Virginia, specifically plans to (1) build a Grade Separated Interchange ("GSI") at the Rio Road and Route 29 Interchange, (2) widen certain sections of Route 29, and (3) build an extension of Berkmar Drive. Plaintiffs, who own commercial property contiguous to the proposed Rio Road GSI, allege that Defendants, various federal and Virginia state officials, have not complied with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*. as they apply to these three projects.

      Plaintiffs contend that Defendants have impermissibly segmented a single action into three individual projects in order to avoid NEPA review and that Defendants have subjected the projects to a lower level of environmental review than what NEPA requires. Plaintiffs also advance two additional claims, which are duplicative of or contingent on their NEPA claims, and

because I determine that their NEPA claims are not likely to succeed, I decline to address these two additional theories here.[1]

The matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction, wherein they ask me to enjoin Defendants and their grantees, employees, agents, and contractors, from any acquisition of right-of-way, financing, contracting, or construction relating to the projects. An evidentiary hearing on the matter was held on June 1, 2015. For the reasons that follow, I will deny Plaintiffs' motion.

## I. Factual Background[2]

The basic facts underlying this case are not in dispute. The question of how to best address congestion on Route 29 in the Charlottesville and Albemarle County areas has long been a source of contention in the area. A western bypass for Route 29, which would route traffic west of Charlottesville, was first proposed in 1979. AR 0021. Although environmental work on this project began shortly thereafter, the Federal Highway Administration ("FHWA") and the Virginia Department of Transportation ("VDOT") did not finalize an environmental impact statement until 1993. AR 0003. The statement defined the primary purpose of the bypass was to "find a solution to existing and future congestion on a three-mile section of U.S. Route 29 between U.S. Route 250 Bypass and the South Fork Rivanna River in the City of Charlottesville and Albemarle County north of Charlottesville," with secondary purpose "to complete a gap in ongoing improvements to U.S. Route 29 through central Virginia." AR 0020. The study concluded that

---

[1] Plaintiffs' claim that Defendants used categorical exclusions in order to avoid the "purpose and need" requirements of an environmental assessment or an environmental impact statement is duplicative of their claim that use of categorical exclusions was improper. Plaintiffs' claim that under Article 1, Section 11 of the Virginia Constitution, Defendants' purported failure to comply with NEPA's requirements prevents them from exercising the power of eminent domain is contingent on the success of Plaintiffs' claims that Defendants violated NEPA.

[2] For ease of discussion, citations to the administrative record (docket no. 24) are referred to as "AR [Bates stamp number]."

– 2 –

Case 3:15-cv-00012-NKM-JCH   Document 43   Filed 06/08/15   Page 2 of 17   Pageid#: 2318

> no single alternative by itself will satisfy all of these needs. For example, a bypass alternative alone will not substantially improve traffic conditions on existing Route 29. Providing improvements only to existing Route 29 will not satisfy anticipated future needs for additional highway capacity, nor will it satisfactorily fulfill Route 29's function as an arterial route for through traffic.

AR 9. Over the next two decades, proposals for the project evolved, and were subject to additional environmental studies, and even litigation. *See Piedmont Envtl. Council v. U.S. Dep't of Transp.,* 159 F. Supp. 2d 260 (W.D. Va. 2001), *aff'd in part and remanded in part,* 58 Fed. Appx. 20 (4th Cir. 2003). During this time, development in the areas surrounding the bypass greatly accelerated, and in February 2014 the FHWA wrote a letter to VDOT stating that the project required a supplement environmental impact statement, in large part because "[o]ur legal counsel has advised us to reassess the purpose and need of the project in light of the changes in the Route 29 corridor that have occurred over the past 20 years to determine if it remains appropriate since the need appears to have expanded well beyond the existing project limits." AR 1052. All work on the bypass was suspended in March 2014, and in June of that year, most of the state funding was removed from the bypass project and reallocated to other projects on Route 29. AR 1160-61.

These other projects included the Rio Road GSI and the Route 29 widening project. AR 1160-61. The Rio Road GSI will separate traffic north-south though traffic on Route 29 from east-west traffic on Rio Road by replacing the existing at-grade intersection with an elevated interchange whereby Rio Road will remain at its present elevation but Route 29 will be lowered to allow through traffic to proceed under the intersection. AR 1710. The Route 29 widening project will expand Route 29 from a 4-lane divided to a 6-lane divided highway for the section of the highway between Polo Grounds Road and Towncenter Drive. AR 1720. The Berkmar Drive extension project will extend the road north from its current terminus at Route 1438, Hilton

– 3 –

Heights Road, to Route 1719, Towncenter Drive. AR 1109. The Berkmar project is an entirely state-funded project, and thus is subject to the Virginia state environmental review process, but not NEPA. AR 1677.

At some point in 2014, the Rio Road GSI and the Route 29 widening projects were considered as recipients for federal funding. AR 1098-1101. VDOT and FHWA produced environmental studies on the two projects, and in June and July of 2014, FHWA approved the resulting categorical exclusions, which found that the projects did not have a significant effect on the human environment and thus did not need further review under an environmental assessment or an environmental impact statement. AR 1716, 1726. The projects were then presented for public comment, and the subsequent comments were compiled in September 2014. AR 1648-1707.[3] FHWA gave the two categorical exclusions final approval on September 29, 2014. AR 1716, 1726.

## II. LEGAL STANDARD

A preliminary injunction constitutes "an extraordinary remedy" granted at the discretion of the district court. *Real Truth About Obama v. Federal Election Com'n*, 575 F. 3d 342, 345 (4th Cir. 2009), *vacated on other grounds* 559 U.S. 1089 (2010), *reissued in part* 607 F.3d 355 (4th Cir. 2010) (reissuing parts I and II of the opinion concerning preliminary injunctions). The Supreme Court of the United States has articulated what a movant must show to obtain a

---

[3] To the extent that Defendants advance an argument of notice and waiver or issue exhaustion, stemming from Plaintiffs' failure to comment during this period, I find it unavailing. The cases cited by Defendants concern third parties challenging agency decision on grounds that federal agencies were not made aware of in the comment period, such as objections that certain alternatives were not considered. *See, e.g., Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (Determining that objection was waived "because respondents did not raise these particular objections to the [environmental assessment], [defendant] was not given the opportunity to examine any proposed alternatives to determine if they were reasonably available.") *High Sierra Hikers Ass'n v. U.S. Forest Serv.*, 436 F. Supp. 2d 1117, 1148 (E.D. Cal. 2006) (explaining that "[t]he question thus becomes whether the challenging party has placed the agency on notice as to the specific alternative it favors"). The logic behind those decisions is inapplicable to the facts of this case, as the FHWA was clearly on notice to follow its own regulations regarding segmentation determining the appropriate level of environmental review.

preliminary injunction: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 20 (2008). The party seeking injunctive relief must carry the burden of persuasion on each of the four elements by "a clear showing." *Real Truth*, 575 F.3d at 345; *accord Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citing 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, pp. 129-130 (2d ed. 1995) (emphasis added; footnotes omitted)). Further, the court in *Winter* explained that when considering whether to grant a preliminary injunction, courts must "balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences." 555 U.S. at 9.

In a case such as the instant action, in which a federal agency's decisions are being challenged, a court's review of the claims must be conducted pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Under the APA, a court will set aside agency determinations if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 763 (2004). An action is arbitrary and capricious if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor VehicleMfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

While "[r]eview under this standard is highly deferential, with a presumption in favor of finding the agency action valid," *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177,

192 (4th Cir. 2009), a court "must not reduce itself to a 'rubber stamp' of agency action," *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.,* 677 F.3d 596, 601 (4th Cir. 2012) (quoting *Fed. Mar. Comm'n v. Seatrain Lines, Inc.,* 411 U.S. 726, 746 (1973)). Rather, it must decide if the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders,* 430 U.S. 99 (1977).

### III. DISCUSSION

This case involves the review of whether a federal agency's actions were proper under NEPA, which stands as the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). As such, NEPA declares a national policy in favor of the protection and promotion of environmental quality. *See Hughes River Watershed Conservancy v. Glickman,* 81 F.3d 437, 443 (4th Cir. 1996) (citing 42 U.S.C. §§ 4321, 4331(a)); *see also* 40 C.F.R. § 1500.1(c) (stating that the purpose of NEPA is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment"). NEPA is fundamentally procedural in nature; "although NEPA establishes environmental quality as a substantive goal, it is well settled that NEPA does not mandate that agencies reach particular substantive results." *Hughes River,* 81 F.3d at 443. The goals of NEPA "are thus realized through a set of action-forcing procedures that require that agencies take a hard look at environmental consequences." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989) (citation and internal quotation marks omitted). So long as "the adverse environmental effects of . . . proposed actions are adequately identified and evaluated, agencies are not constrained by NEPA from deciding that other values outweigh the environmental costs." *Hughes River I,* 81 F.3d at 443 (citation, internal quotation marks, and alterations omitted).

Generally, NEPA requires every agency proposing a "major Federal action" to prepare an environmental impact statement if the action will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(C). Based on regulations promulgated by the Council on Environmental Quality, agencies must establish procedures identifying "[s]pecific criteria for and identification of those typical classes of action" that require or do not require an environmental impact statement. 40 C.F.R. § 1507.3(b)(2). In considering any particular proposed action, an agency must first determine whether, under its own regulations, the proposal would "[n]ormally require [] an environmental impact statement" or "[n]ormally [would] not require either an environmental impact statement or an environmental assessment. . . ." *Id.* §§ 1501.4(a)(1), (2). The latter, where neither an environmental impact statement nor an environmental assessment is required, refers to categorical exclusions, which were used for the two federal projects at issue here: the construction of the Rio Road GSI and the widening of Route 29. *See* 40 C.F.R. § 1500.4(p) (explaining that categorical exclusions are actions "which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement.").

### A. Standing

In this case, Plaintiffs must meet not only the standing requirements of Article III of the United States Constitution, they must also establish that their legal action falls within the "zones of interest" protected by the statute that provides their cause of action. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1382, 188 L. Ed. 2d 392 (2014); *see also Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480 (4th Cir. 2003) (applying this test in the context of NEPA). Courts interpreting this requirement have generally defined the zone of interest protected by NEPA to encompass environmental, but not economic, concerns. *See, e.g.,*

*Taubman*, 320 F.3d at 481; *ANR Pipeline Co. v. Fed. Energy Regulatory Comm'n,* 205 F.3d 403 (D.C. Cir. 2000); *Nev. Land Action Ass'n v. U.S. Forest Serv.,* 8 F.3d 713, 715 (9th Cir. 1993). Plaintiffs' alleged economic injuries are sufficient to confer Article III standing. *Sierra Club v. Morton*, 405 U.S. 727, 733 (1972). Given the evidence introduced at oral argument regarding Plaintiffs' environmental injuries, as well as their physical proximity to the Rio Road GSI, Plaintiffs have also established that their action falls within the zone of interest protected by NEPA. *See Hodges v. Abraham*, 300 F.3d 432, 444-45 (4th Cir. 2002) (explaining that "an individual living next to the proposed site for a federally licensed dam would possess standing to challenge a failure to comply with NEPA. . . .").

### B. Preliminary Injunction

As stated above, a plaintiff seeking injunctive relief must establish, by a clear showing, "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter,* 555 U.S. at 20.

#### 1. Irreparable Harm

"Irreparable injury is suffered when monetary damages are . . . inadequate." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co*., 22 F.3d 546, 551–52 (4th Cir. 1994), *abrogated on other grounds by Winter* 555 U.S. 7 (2008) (citation omitted) (internal quotation marks omitted). Further, the party seeking injunctive relief must demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Winter* 555 U.S. at 22 (emphasis in original).

Plaintiffs argue that they will suffer irreparable harm because the construction of the Rio Road GSI will entail a taking of their property, and further contend that this construction, if

– 8 –

completed, will decrease the accessibility and visibility of their businesses. However, "it is beyond dispute that economic losses generally do not constitute irreparable harm. . . ." *North Carolina Growers' Ass'n, Inc. v. Solis*, 644 F. Supp. 2d 664, 671 (M.D.N.C. 2009); *see also McGean v. Montgomery Cnty,* 87 F.3d 1309 (4th Cir. 1996) ("Harm is not considered irreparable if it can be compensated by money damages during the normal course of litigation."). To the extent that the proposed projects will result in a physical taking of Plaintiffs' property or otherwise diminish its value, state and federal law provide avenues by which Plaintiffs can seek compensation. *See Kitchen v. City of Newport News*, 275 Va. 378, 392-93 (2008) (explaining remedies for a taking under Virginia law); *Arkansas Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 518, 184 L. Ed. 2d 417 (2012) (same, but with respect to federal law). Accordingly, any economic injury suffered by Plaintiffs in the absence of injunctive relief is not irreparable. *See Canada v. Ray*, No. 7:08CV00219, 2010 WL 2179053, at *1 (W.D. Va. May 28, 2010) ("The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm.") (quoting *Va. Chapter, Associated Gen. Contractors, Inc. v. Kreps,* 444 F.Supp. 1167, 1182 (W.D. Va. 1978)).

Plaintiffs also claim that they will suffer environmental harm absent injunctive relief. They argue that, should the Rio Road GSI project go forward, they would suffer "adverse environmental harm, including, but not limited to, storm water impacts, and petroleum contaminated media impacts." Compl. ¶ 43. They expounded on this generalized statement at oral argument, expressing concerns over potential impacts on air and water quality, which they claim have been inadequately studied because the FHWA has not completed an environmental assessment or an environmental impacts statement. It is well settled that this kind of environmental injury constitutes irreparable harm. *Amoco Prod. Co. v. Vill. of Gambell*, 480

– 9 –

U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."). Accordingly, Plaintiffs have met the irreparable harm requirement. *See South Carolina Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 330 (4th Cir. 2008) (explaining that in the context of an alleged NEPA violation, "[t]he party seeking an injunction need not show that injunction of the state defendant would lead directly to redress of the asserted injury, but only that relief will preserve the federal procedural remedy.")

### 2. Balance of Equities and Public Interest

Plaintiffs must next show that the balance of equities tips in their favor. *Winter,* 555 U.S. at 20. This inquiry asks courts to "balance the competing claims of injury and [] consider the effect on each party of the granting or withholding of the requested relief." *Doe v. Pittsylvania Cnty.,* 842 F. Supp. 2d 927, 930 (W.D. Va. 2012) (quoting *Winter,* 555 U.S. at 24). Additionally, Plaintiffs must establish by a clear showing that the public interest favors granting an injunction. *Winter*, 555 U.S. at 20. In evaluating this factor, courts must "pay particular regard for the public consequences" of granting an injunction. *Id.*

Plaintiffs argue that the balance of equities tips in their favor because the environmental impacts of the projects have been inadequately studied, and proceeding with the possibly ill-advised projects will deprive them of a valuable property interest while simultaneously wasting public resources. Defendants respond that the projects will improve the quality of life of thousands of people by reducing congestion and enhancing safety. Defendants further contend that the balance of equities actually tips in their favor, given that a one-year delay in the Rio Road GSI would cost tax payers and the contractors involved with the project roughly forty million dollars. On these facts, Plaintiffs have failed to establish by a clear showing that either

the balance of equities tips in their favor or that the public interest favors granting injunctive relief.

### 3. Likelihood of Success on the Merits

Plaintiffs allege that Defendants violated NEPA in two ways. First, they assert that Defendants impermissibly segmented the Rio Road GSI, the Route 29 widening, and the Berkmar Drive proposals into three distinct projects, when NEPA required Defendants to review the project as a single action. Second, they argue that Defendants impermissibly classified the Rio Road GSI and the Route 29 widening projects as categorical exclusions in order to avoid the need to prepare an environmental assessment or environmental impact statement. For the reasons explained below, I cannot say at this stage of the proceedings and under this standard of review that Plaintiffs are likely to succeed on the merits of either claim.

#### a. Segmentation of the Projects

A large project may not be broken into smaller component parts in order to avoid NEPA review. *Wilds v. S. Carolina Dep't of Transp.*, 9 F. App'x 114, 120 (4th Cir. 2001); *see also* 40 C.F.R. § 1502.4(a) ("Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement."). In order to determine if a project has been improperly segmented, a court must look to the factors listed in FHWA's anti-segmentation regulations, which state that each individual project must:

> (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;
>
> (2) Have independent utility or independent significance, *i.e.,* be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

– 11 –

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f).

The first prong articulated by the FHWA regulations asks whether each individual project connects logical termini and is of sufficient length to address environmental matters on a broad scope. "Logical termini are often obvious because of their connection to 'crossroads, population centers, major traffic generators, or similar highway control elements.'" *Id.* (quoting *Conservation Law Found. v. Fed. Highway Admin.,* 24 F.3d 1465, 1472 (1st Cir. 1994)). Plaintiffs argue that the end points of the Rio Road GSI are not rational end points for a transportation improvement, as the Rio Road GSI would receive and deposit traffic from two proposed but unconstructed road extensions, one located south of the Rio Road GSI at Berkmar Drive and another located north of the project at Hillsdale Drive. Defendants respond that the FHWA carefully reviewed the projects and determined that they had logical termini notwithstanding the construction of any other proposed roadway improvements, especially considering that their purpose is to relieve *local* congestion. Given the fact that the Rio Road GSI is an improvement of an existing intersection and essentially creates no new termini, I can discern no basis to declare that its termini are illogical.

The second prong of the FHWA regulations examines the projects' independent utility or independent significance. This inquiry asks "whether each project would have taken place in the other's absence," and "[i]f so, [the projects] have independent utility and are not considered connected actions." *Defenders of Wildlife*, 762 F.3d at 395. "When determining whether an action has independent utility, courts consider the benefits and uses that will occur as a result of that action, even if no other construction is done in the area." *Id*.

Plaintiffs argue that the projects will not "be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made." 23 C.F.R. § 771.111(f)(2). They make much of the following language from the 2003 Final Supplemental Environmental Impact Study, which was prepared for the later abandoned Route 29 bypass project:

> [t]he interchanges proposed at Hydraulic Road, Greenbrier Drive, and Rio Road would remove five at-grade crossings of Route 29 thereby eliminating conflicts between crossing traffic and mainline Route 29 traffic as well as the traffic signals regulating those conflicts. However, this intersection congestion merely would be relocated from the existing intersection locations to the interchange ramp termini. Although the interchanges would improve travel conditions on segments of existing Route 29 they would not do so to the extent that the Bypass would not be needed.

AR 0387. Plaintiffs assert that this language demonstrates that the Rio Road GSI would lack independent utility absent the construction of a bypass. I read this language differently. The FHWA determined that the construction of GSIs would improve travel conditions on Route 29 by relocating traffic congestion to ramps, thus allowing through traffic to proceed unhindered. This improvement, however, would not be so dramatic that further measures to improve traffic conditions, such as construction of the bypass, would be unnecessary. Indeed, I find the 2003 study supports Defendants' contention that each of the projects will independently improve mobility and reduce congestion regardless of whether any of the other projects are built.

The third prong considers whether the projects restrict consideration of alternatives for other reasonably foreseeable transportation improvements. Plaintiffs do not appear to contest this issue, and in any event, I can find no evidence to suggest that completion of the projects would curtail consideration of alternatives. Accordingly, Plaintiffs have not established by a clear showing that they are likely to prevail on the merits of an improper segmentation claim.

### b. Use of Categorical Exclusions

Projects that qualify for a categorical exclusion do not require an environmental assessment or an environmental impact statement. Federal regulations promulgated by the Council on Environmental Quality direct that "[a]gencies shall reduce excessive paperwork by: . . . (p) Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement." *City of Alexandria, v. Fed. Highway Admin.*, 756 F.2d 1014, 1018 (4th Cir. 1985) (quoting 40 C.F.R. § 1500.4). Accordingly, the FHWA has developed its definition of a categorical exclusion:

> Categorical exclusions are actions which: do not induce significant impacts to planned growth or land use for the area; do not require the relocation of significant numbers of people; do not have a significant impact on any natural, cultural, recreational, historic or other resource; do not involve significant air, noise, or water quality impacts; do not have significant impacts on travel patterns; or do not otherwise, either individually or cumulatively, have any significant environmental impacts.

23 C.F.R. § 771.117(a). FHWA regulations allow for two types of categorical exclusions: 23 C.F.R. § 771.117(c), which lists twenty specific listed actions that may be evaluated as a categorical exclusion without the production of any additional documentation, and 23 C.F.R. § 771.117(d), which provides for a catch-all "documented categorical exclusion."[4] The Rio Road GSI and the Route 29 widening projects were classified under the latter.

FHWA regulations give twenty examples of what may properly be considered a "documented categorical exclusion," and these examples are given great weight in determining whether classification of a project as such was arbitrary and capricious. *See City of Alexandria,* 756 F.2d at 1019 (explaining that "the more specific examples of categorical exclusions listed in the regulations, rather than a party's or our own notions of substantiality, give adequate meaning

---

[4] That is, a categorical exclusion for projects that meet the general definition of a categorical exclusion set forth in 40 C.F.R. § 1508.4, and 23 C.F.R. § 771.117(a), and for which the applicant submits documentation demonstrating compliance with the categorical exclusion criteria.

– 14 –

to the general definition."). However, the regulations also require the preparation of "appropriate environmental studies" if an action which would normally be classified as a categorical exclusion "could involve unusual circumstances," defined by example as:

> (1) Significant environmental impacts;
>
> (2) Substantial controversy on environmental grounds;
>
> (3) Significant impact on properties protected by section 4(f) of the DOT Act or section 106 of the National Historic Preservation Act; or
>
> (4) Inconsistencies with any Federal, State, or local law, requirement or administrative determination relating to the environmental aspects of the action.

23 C.F.R. § 771.117(b)

As an initial matter, Plaintiffs argue that neither the Rio Road GSI nor the Route 29 widening qualify as a categorical exclusion because these projects will use a "design build" approach, wherein design and construction take place simultaneously. Their logic is that, because the projects could change, it is impossible to know their environmental impacts, and thus Defendants cannot know that the impact will not reach a level such that an environmental assessment or an environmental impact statement is required. Notably, Plaintiffs do not cite any legal precedent in support of this position. And, furthermore, FHWA regulations provide that projects classified as categorical exclusions are subject to an ongoing review process to ensure that the classification remains appropriate. *See Ware v. U.S. Fed. Highway Admin.*, No. CIV.A. H-04-2295, 2006 WL 696551, at *8 (S.D. Tex. Mar. 15, 2006) (explaining how under FHWA regulations, "[e]ven after a project is approved for Categorical Exclusion status, the project must be reviewed again to ensure that the classification remains appropriate.") (citing 23 C.F.R. § 771.129(c)). Accordingly, I reject Plaintiffs' suggestion that a "design build" project is inherently incompatible with categorical exclusion review.

Plaintiffs also argue that the projects are not analogous to any of the examples listed in 23 C.F.R. § 771.117(d). The case they cite in support of this proposition, *West v. Secretary of Transp.*, 206 F.3d 920 (9th Cir. 2000), is distinguishable because it dealt with the construction of an "entirely new, $18.6 million, four-lane, 'fully-directional' interchange constructed over a former Superfund site." *Id.* at 928. In response, Defendants argue that the Rio Road GSI is similar to 23 C.F.R. § 771.117(d)(3), which, at the time of classification, provided categorical exclusion status to: "[b]ridge rehabilitation, reconstruction or replacement or *the construction of grade separation* to replace existing at-grade railroad crossings." (emphasis added). They argue that construction of a highway GSI is analogous to a railroad GSI. I find this argument persuasive, particularly given the fact that the construction will take place at an existing intersection, and agree that the FHWA's decision to classify the Rio Road GSI as a categorical exclusion under 23 C.F.R. § 771.117(d) was not arbitrary and capricious.

Finally, Plaintiffs argue that there are unusual circumstances surrounding the projects. As noted above, "unusual circumstances" exist where there are "significant environmental impacts" or "substantial controversy on environmental grounds." 23 C.F.R. § 771.117(b). Plaintiffs have provided no evidence of significant environmental impact, and a review of the administrative record does not reflect substantial controversy on environmental grounds. Indeed, the vast majority of the comments focused on the potential economic impact of the projects. *See* AR 1648-1707. Accordingly, I cannot say that unusual circumstances surrounded the project.

### IV. CONCLUSION

As set forth above, Plaintiffs' motion for a preliminary injunction will be denied. An appropriate order accompanies this memorandum opinion.

Entered this __8th__ day of June, 2015

– 16 –

Case 3:15-cv-00012-NKM-JCH   Document 43   Filed 06/08/15   Page 16 of 17   Pageid#: 2332

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE